**UNITED STATES of America, Plaintiff,**

v.

**CITY OF MONROE, GA,
et al., Defendants.**

No. 3:94–CV–45(WDO).

United States District Court,
M.D. Georgia,
Athens Division.

April 15, 1997.

---

Frank L. Butler, III, Macon, GA, Marcel A. Bryar, Washington, DC, for U.S.

John Edward Allen, Jr., Michael C. Daniel, Richard L. Ford, Athens, GA, Russell P. Preston, Eugene M. Benton, Monroe, GA, for City of Monroe, GA.

John Edward Allen, Jr., Richard L. Ford, Athens, GA, Russell P. Preston, Eugene M. Benton, Monroe, GA, for Harry Knight, Monroe City Council, Randy Peppers, Jerry Smith, Hugh Bolton, Phillip J. Enslen, Rosemary B. Mathews, Larry Wayne Adcock, Sara Campbell.

Before ANDERSON, Circuit Judge, FITZPATRICK, Chief Judge, and OWENS, District Judge.

## MEMORANDUM OPINION

In the instant case, the United States seeks an injunction barring the City of Monroe from using a majority-vote requirement in its mayoral elections until this requirement receives federal approval according to Section 5 of the Voting Rights Act. 42 U.S.C. § 1973c. For the reasons set out below, we conclude that the United States is entitled to relief.

Before we address the precise arguments advanced by the parties, we briefly summarize the scope of our jurisdiction in a § 5 suit and set out the historical facts regarding the City of Monroe's majority-vote requirement and the procedural posture of the case today.

### I. THE SCOPE OF OUR § 5 INQUIRY

Section 5 of the Voting Rights Act of 1965 requires covered jurisdictions to gain federal approval before enforcing any "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964." 42 U.S.C. § 1973c. Federal approval, known as "preclearance," may be gained by obtaining a declaratory judgment from the District Court for the District of Columbia to the effect that the change involved "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or [membership in a language minority group]." *Id.* Alternatively, a jurisdic-

tion may elect to seek preclearance from the United States Attorney General: if the Attorney General has not interposed an objection within sixty days after the jurisdiction submits the change or if the Attorney General has affirmatively indicated that no objection will be made, then the State may enforce the change. Pending either form of preclearance, "[s]tatutory provisions constituting changes in election practices are not 'effective as laws ....'" *McCain v. Lybrand*, 465 U.S. 236, 244, 104 S.Ct. 1037, 1043, 79 L.Ed.2d 271 (1984) (quoting *Connor v. Waller*, 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975) (per curiam)).

 It is well-established that either the Attorney General or a private plaintiff may bring an action in the district courts to enforce the preclearance mandate of § 5. *Allen v. State Board of Elections*, 393 U.S. 544, 555–58, 89 S.Ct. 817, 826–27, 22 L.Ed.2d 1 (1969); 42 U.S.C. § 1973j(d). According to the express terms of the Act, any such action must be heard by a three-judge panel in accordance with the provisions of 28 U.S.C. § 2284. 42 U.S.C. § 1973c. When presented with a § 5 suit, a three-judge panel such as the one convened here today may determine only "(i) whether a change was covered by § 5, (ii) if the change was covered, whether § 5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy was appropriate." *City of Lockhart v. United States*, 460 U.S. 125, 129 n. 3, 103 S.Ct. 998, 1001 n. 3, 74 L.Ed.2d 863 (1983). What we may not decide is "what Congress expressly reserved for consideration by the District Court for the District of Columbia or the Attorney General—the determination whether a covered change does or does not have the purpose or effect 'of denying or abridging the right to vote on account of race or color.'" *Perkins v. Matthews*, 400 U.S. 379, 385, 91 S.Ct. 431, 435, 27 L.Ed.2d 476 (1971).

## II. FACTS AND PROCEDURAL POSTURE

### A. *Historical Facts regarding the City's Election Practices* [1]

The City of Monroe is a municipal corporation created by legislative act of the General Assembly of Georgia; the City derives all of its powers from this and from subsequent legislative acts. Prior to November 1, 1964 (the baseline date from which § 5 changes are measured), the City of Monroe's charter did not specify whether election of the mayor and city council would be by majority vote or by a plurality. However, the parties agree that prior to November 1, 1964, the City used a plurality-vote requirement to decide races in which more than two candidates ran for office.

In 1966, the General Assembly amended the City's charter to require that the election of the mayor and the members of the city council be determined by majority vote. 1966 Ga. Laws 2457, 2459. Although the amendment was neither submitted to the Attorney General nor was a declaratory judgment brought before the District Court for the District of Columbia, the City proceeded to conduct elections under the majority rule imposed by the new charter.

In 1968, the General Assembly enacted a comprehensive Municipal Election Code applicable to all Georgia municipalities including the City of Monroe. (We refer to this statute as "the 1968 Statewide Code.") Section 34A–1407 of the Code reads in relevant part:

> Municipal Charter to govern vote required for nomination; runoff primary or election—(a) If the municipal charter or ordinance, as now existing or as amended subsequent to the effective date of this Subsection, provides that a candidate may be nominated or elected by a plurality of the votes cast to fill such nomination or public office, such provision shall prevail. Otherwise, no candidate shall be nominated for public office in any primary or elected to public office in any election unless such candidate shall have received a majority of the votes cast to fill such nomination or public office.

By letter dated May 13, 1968, the State of Georgia submitted the Statewide Code to the

---

1. We find the parties in agreement as to the facts material to this litigation.

Attorney General for § 5 preclearance. The State of Georgia's application noted:

> Heretofore, the laws governing municipal elections have been contained in the charters of the more than 400 incorporated towns and cities in Georgia. These charter provisions as to elections have been amended from time to time.... As a consequence, there have been as many or more variations in the municipal election laws in Georgia as there are municipalities.

> . . . . .

> At the 1968 Session of the General Assembly of Georgia, there was enacted the "Georgia Municipal Election Code," ... which codifies and makes uniform throughout the State (with certain options hereinafter noted) municipal election laws.

> . . . . .

> In view of the variety of laws which heretofore existed, no effort will be made herein to set forth the prior laws superseded by the Municipal Election Code. In view of its comprehensive nature, the Municipal Election Code when read in sequence is comprehensible, and therefore only its more significant features will be discussed herein.

The State then provided a list of the major areas in which this Code differed from the general election code governing nonmunicipal elections. In this list, the State referred to § 34A-1407 as follows:

> Whether the majority or plurality rule is in effect in the municipal election will depend upon how the municipality's charter is written at present or may be written in [the] future (i.e., charter may provide that the top 3 or top 5, etc., be elected as city commissioners).

On July 11, 1968, the Attorney General responded to the State's submission, objecting to certain provisions of the 1968 Statewide Code. No objection was interposed regarding § 34A-1407 (a)

Three years later, in 1971, the General Assembly enacted a comprehensive revision of the City of Monroe's charter. Section 2.03 of the 1971 charter reads in pertinent part:

> The candidate for mayor who receives a majority of votes cast in said election and the two candidates for councilmen who receive a majority of votes cast in their respective elections shall be elected for terms of office of two years each and until their successors are duly elected and qualified.

1971 Ga. Laws 3221, 3227. Like the 1966 charter revision, Section 2.03 was neither submitted to the Attorney General nor made the basis of a declaratory judgment action before the District Court for the District of Columbia.

In 1976, two black citizens of Monroe brought a § 5 suit against the City, alleging that neither the majority-vote provision of the 1966 Charter nor the majority-vote provision of the 1971 Charter had been precleared according to the mandates of the Act. In addition, the plaintiffs complained that three annexation ordinances had not been properly precleared. On July 29, 1976, a three-judge panel agreed with the plaintiffs, holding that "[t]he enactment of a majority vote requirement is subject to section five, and those laws cannot therefore be further utilized until its procedures have been followed." *Howard v. Board of Commissioners of Walton County*, No. 75-67-ATH, slip op. at 3 (M.D.Ga. July 29, 1976). Accordingly, the three-judge panel enjoined enforcement of "[t]hose parts of [the 1966 and 1971 Charters] which provide for election of the mayor and councilmen of the City of Monroe by majority vote.... " *Id.* at 5. The panel similarly held that the annexations had not been precleared as required and, therefore, that defendants were enjoined from enforcing the ordinances effecting the annexations.

In its order, the three-judge panel noted that the City claimed that even if enforcement of the 1966 and 1971 charter provisions was enjoined, the 1968 Statewide Code mandated majority-vote elections in all cities except those whose charter provided otherwise. "This general statute was enacted in 1968, [1968 Ga.Laws 885]," noted the panel, "and according to the parties has been approved by the Attorney General pursuant to section

five."[2] *Id.* at 4. The panel wrote, "The application of this general law in this instance and the resolution of this issue does not require a three-judge court." *Id.* Accordingly, the case was remanded to the originating judge for further proceedings consistent with the panel's opinion.

On July 29, 1976, the originating judge issued an order responding to the panel's request. With respect to the City of Monroe, the judge wrote:

> The issue concerning the city is whether a majority or plurality vote is required for the election of mayor and councilmen.
>
> The 1971 city charter, [1971] Ga. Laws 3221, 3227, and an amendment to the predecessor charter, [1966] Ga. Laws 2458, provided for the election of the mayor and council by a majority vote. Both of these statutes having been declared unenforceable under section five, the remaining city charter is silent as to whether a plurality or majority vote is required. The parties agree that the city conducted plurality elections until enactment of [1966] Ga. Laws 2458.
>
> Georgia's Municipal Election Code, Ga. Code Ann. § 34A–1407(a), provides:
>
>> If the municipal charter or ordinance, as now existing or as amended subsequent to the effective date of this subsection, provides that a candidate may be nominated or elected by a plurality of the votes cast to fill such nomination or public office, such provision shall prevail. Otherwise, no candidate shall be nominated for public office in any primary or elected to public office in any election unless such candidate shall have received a majority of the votes cast to fill such nomination or public office.
>
> Since neither the charter nor an ordinance of the City of Monroe now or ever has provided for a plurality election, this general law, which the parties have informed the court was approved by the Attorney General of the United States as required

by section five, clearly applies here and requires election by majority vote. Plaintiffs' argument that the Monroe city charter must have provided for election by plurality vote because the city conducted elections on a plurality basis prior to the 1966 law is not persuasive. Such an interpretation would make a nullity of this general statute and void its obvious purpose of establishing an unambiguous rule for municipalities with charters lacking an express requirement.

*Howard v. Board of Commissioners of Walton County,* No. 75–67–ATH, op. at 3–4 (M.D.Ga. July 29, 1976).

On August 12, 1976, two weeks after the three-judge panel issued its order, the City submitted to the Attorney General the three annexations that the *Howard* court determined required preclearance. Attached to the submission were copies of the three-judge court's decision and the originating judge's order. Four days later, on August 16, the Attorney General received a letter from David Walbert, counsel for the *Howard* plaintiffs. In his letter, Walbert focused on the *Howard* court's resolution of the issue regarding the City's majority-vote requirement: he described the court's rejection of his argument that despite preclearance of the 1968 Act, individual municipalities were required to have § 5 approval before implementing the majority vote. Walbert wrote:

> We are presently debating an appeal based on the same issues we briefly outlined in the trial court. . . .
>
> My question to you is whether the Department of Justice would have an interest in this case. If the Department, as the enforcer of Section V, agreed with our positions and would see fit to intervene in the case, our chances would be vastly improved in my opinion. . . .

Walbert's letter indicates that he also submitted a copy of an order from the *Howard* litigation.

---

**2.** When the parties made this representation to the court, they did not have the benefit of the Supreme Court decision in *City of Rome v. United States,* 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980), which was not decided until

almost four years later. In *City of Rome,* the Court held that the preclearance of the 1968 Statewide Code did not preclear the majority-vote provision in the several municipalities. *See* discussion in Part V.A. *infra.*

During discovery in this case, the Attorney General produced its internal records with regard to the intervention request from Mr. Walbert and the request from the City for preclearance of its annexations. The records reveal that the internal discussions within the Attorney General's office during the fall of 1976 and 1977 focused on two matters. First, we find some discussions regarding whether the City's majority-vote requirement had already been precleared. This discussion related to whether or not the Attorney General's previous preclearance of the 1968 Statewide Code precleared the majority-vote requirement in the City of Monroe. Second, we find deliberations concerning whether the annexations proposed by the City would have a discriminatory purpose or effect. To answer this question, the Attorney General of course took into account the election practices of the City, and thus the annexation deliberations include frequent references to the City's majority-vote requirement.

As for the annexation deliberations, the record reveals the following events. By letter dated October 13, 1976, the Attorney General interposed an objection to two of the three annexations proposed by the City of Monroe. On October 18, 1976, the City's attorney requested that the City be allowed to submit further evidence and that the Attorney General reconsider its objection; the City also requested a conference with representatives of the Attorney General. On May 26, 1977, the conference requested by the City Attorney was held in the Monroe. Because the meeting was not formally documented, the record does not disclose precisely what transpired at the conference. The record does reveal that the conference was attended by representatives of the Attorney General, the City of Monroe, and of the black community; similarly, it is clear that the parties discussed the history of black political participation in Monroe and in Walton County. The City's request for reconsideration was considered complete on September 29, 1977, and by letter dated November 25, 1977, the Attorney General withdrew its objection to the two annexations, stating that "[a] re-

view of this entire record reveals that the dilution of the black population caused by these annexations was approximately one half percent and that this small degree of dilution, in the demographic and electoral context of the City of Monroe, will have no discernible racially discriminatory electoral effect."

As for the preclearance status of the majority-vote requirement, the record shows the following events. Sometime during October and November of 1976, approximately the same time as the initial denial of annexation preclearance and the request for reconsideration, David Hunter (an attorney in the Voting Rights section) prepared a memo directed to the Assistant Attorney General recommending that a letter be sent to the City of Monroe requesting that they submit their majority-vote requirement for preclearance. The memo, which was accompanied by a proposed draft for such a "please submit" letter, also recommended that the Attorney General "if necessary, participate in *Howard v. Board of Commissioners of Walton County* (as amicus or intervenors) or bring our own suit to assure compliance with Section 5." The record reveals no further deliberation on whether to follow Hunter's recommendations; the paper trail ends abruptly with a proposed "please submit" letter across the top of which is the handwritten notation "Not sent." Because the notation is not accompanied by a date, it is impossible for us to ascertain where in the chronology of events the decision not to send the letter was made.[3] We know only that there was discussion as to whether the previous preclearance of the 1968 Statewide Code precleared the City's majority-vote requirement and that the Attorney General did not implement the Hunter recommendation—i.e., the City of Monroe was not advised that it should submit its majority-vote requirement for preclearance.

In 1990, thirteen years after the *Howard* litigation began, the Georgia General Assembly again enacted an amendment to Monroe's charter. The preamble to the Act describes the purposes of the amendment as follows:

---

**3.** A routing and transmittal slip dated January 5, 1977, suggests that the "please submit" letter was still being circulated through the Voting

Rights section at that time. We find no further hints as to the timing of or rationale for the decision not to send the letter.

"to change the date of municipal elections; to provide for election of the mayor and councilmembers; to provide for terms; to repeal conflicting laws; and for other purposes." 1990 Ga. Laws 4163. Section 1 of the 1990 Act carries forward the majority-vote requirement found in the City's previous charters. 1990 Ga. Laws 4163, 4163–4165.

On September 26, 1990, the city attorney sent a copy of the 1990 Act to the Attorney General for Section 5 preclearance. The letter accompanying the submission singled out various changes effected by the legislation regarding the date of elections, the length of terms, and the staggering of councilmembers' terms; the letter made no specific reference to the majority-vote provision. In reviewing this submission, the Attorney General's attention again turned to the majority-vote requirement and its tortuous history.[4] The Attorney General requested copies of the 1966 and 1971 charters, which the City submitted in accordance with the request. On July 3, 1991, the Assistant Attorney General informed the City that the Attorney General objected to the change from plurality voting to majority voting. Although the City twice requested reconsideration, the Attorney General refused to withdraw the objection. On June 3, 1994, the United States filed the instant suit against the City of Monroe, its mayor, councilmembers, and city clerk (collectively described as "the City"), alleging *inter alia* that the enforcement of the majority-vote requirement in the City's mayoral elections violates § 5.[5]

### B. *Procedural Posture of the Instant Case*

The United States and the City of Monroe have each filed a motion for summary judgment on the § 5 claim regarding the majority-vote requirement for the City's mayoral elections. On August 9, 1996, the panel heard oral argument on the parties' summary judgment motions. Because it is clear that the parties do not dispute the facts material to this litigation, but only the legal significance of those facts, summary judgment is appropriate at this time.

### III. PRECLUSIVE EFFECTS OF THE *HOWARD* LITIGATION

■ Before we proceed to address the questions we are directed to answer in a § 5 case—i.e., whether § 5 covers the contested change, whether that change has been precleared, and if not, what remedy is appropriate—we must address the City's argument that the United States's suit is barred by the preclusive effects of the decision in *Howard v. Board of Commissioners*. After reviewing the case law, we conclude that there is an insufficient identity of parties to invoke issue or claim preclusion. *See Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) ("A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that 'a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit *between the same parties or their privies* .... ' ") (emphasis added). On these facts, the Attorney General cannot be barred from re-litigating the claims and issues brought by the private plaintiffs in *Howard.*[6]

■ The City of Monroe has expended considerable time arguing that in *this* case

---

4. The 1990 submission and the ensuing correspondence is, like the 1976 documentation, voluminous and complicated. Because none of the issues implicated in this case turns on the precise details of the events occurring between 1990–1993, we do not dwell on these details.

5. The complaint originally filed by the United States includes additional claims not before us today. In addition to the § 5 claim regarding the mayoral elections, Count I alleged that the use of majority vote in the city-council elections violated § 5. Count II alleged that the City's majority-vote requirement and at-large election of its councilmembers violated § 2 of the Voting

Rights Act as well as the Fourteenth and Fifteenth Amendments. During the course of this litigation, the United States and the City of Monroe reached an agreement regarding the method of electing city councilmembers.

6. Because we find an insufficient identity of parties, we make no effort to identify rigorously the claim at issue in *Howard* or the scope of issues actually litigated and decided therein. Similarly, we do not address additional arguments offered by the United States as grounds for finding no preclusion.

the Attorney General should be bound by the decision in *Howard* even though the Attorney General was not a formal party to the litigation. We address each of the City's arguments in turn. First, the City argues that in the instant case the Attorney General should be bound because of an identity of interests between the Attorney General and the private plaintiffs in *Howard*.[7] The City argues:

> Obviously, in the present case, the United States purports to represent the same interests and individuals as did the plaintiffs in *Howard*. Indeed, the United States has its authority to bring suit only in a representative capacity on behalf of its alleged aggrieved citizens. Moreover, in the *Howard* litigation, the plaintiffs sought to make the suit a class action suit thereby demonstrating their intent to sue in a representative capacity for all alleged aggrieved persons. In this case, since the United States purports to represent all of the same individuals who were plaintiffs in the *Howard* suit (and all similarly situated persons), they are deemed to be privies for the purpose of a preclusion analysis and are therefore bound by the *Howard* decision.

This argument is foreclosed by *United States v. East Baton Rouge Parish School Board*, 594 F.2d 56 (5th Cir.1979), a decision binding on this court.

In *East Baton Rouge*, the Court of Appeals rejected a district court's conclusion that a suit brought by the Attorney General under the Voting Rights Act was precluded by earlier litigation conducted by private plaintiffs. The court wrote:

> [T]he district court's conclusion is directly contrary to the general principle of law that the United States will not be barred from independent litigation by the failure of a private plaintiff. *See, e.g., City of Richmond v. United States*, 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975).... This principle is based primarily on the recognition that the United States has an interest in enforcing federal law that is independent of any claims of private citizens. In the present context the Supreme Court has characterized this as "the highest public interest in the due observance of all constitutional guarantees." *United States v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). Also, any contrary rule would impose an onerous and extensive burden upon the United States to monitor private litigation in order to ensure that possible mishandling of a claim by a private plaintiff could be corrected by intervention.
>
> Second, even assuming that the United States has no independent interest, the prior suit would not bar the present action. In *United States v. Texas*, 430 F.Supp. 920 (S.D.Tex.1977), a three-judge district court ... found res judicata inapplicable because the prior private suits were not certified as class actions, and, therefore, the United States could represent the interests of members of the putative class who were not named plaintiffs in the previous suits. 430 F.Supp. at 926. Similarly, in the present case, although the private suit was brought as a class action, the trial judge did not certify a class prior to the dismissal. Res judicata, therefore, could not properly apply to members of the putative class, or derivatively, to the United States.

594 F.2d at 58–59. The reasoning of the court in *East Baton Rouge* squarely rejects the precise arguments made by the City of Monroe today.

In support of its holding, the Fifth Circuit in *East Baton Rouge* relied upon the Supreme Court's decision in *City of Richmond v. United States*, 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975). In *City of Richmond*, a voting-rights case, the Supreme Court rejected an argument that "estoppel effect" should be given to the judgment in a previous private-plaintiff suit involving the same annexation in question in *City of Richmond*. The Court wrote, "[W]e find controlling the nonparticipation of the United States and the

---

7. A non-party may be subject to the preclusive effects of a prior judgment "in certain limited circumstances [in which the non-party] ... has his interests adequately represented by someone with the same interests who is a party." *Martin v. Wilks*, 490 U.S. 755, 762, 109 S.Ct. 2180, 2184, 104 L.Ed.2d 835 (1989).

Attorney General in [the earlier litigation]." [8] *Id.* at 373 n. 6, 95 S.Ct. at 2305 n. 6. *Accord Hathorn v. Lovorn,* 457 U.S. 255, 268 n. 23, 102 S.Ct. 2421, 2430 n. 23, 72 L.Ed.2d 824 (1982) ("The Attorney General is not bound by the resolution of § 5 issues in cases to which he was not a party.") (citing *City of Richmond*).

■ Next, the City argues that the Attorney General, though a nonparty, may be bound by a prior judgment because "there is an identity of issues and the nonparty knew of the first action yet failed to intervene to assert its claims." Clearly, the Attorney General in the instant case was aware of the *Howard* litigation and did not intervene. However, the Supreme Court has rejected the claim that a conscious decision not to intervene justifies subjecting a nonparty to the preclusive effects of a prior judgment. In *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), the Supreme Court concluded that a discrimination suit brought by black firefighters and resolved by consent decree could not bar white firefighters' subsequent reverse discrimination suit even though the white firefighters were aware that the black firefighters' suit could affect their interests and did not move to intervene. The Court first quoted from an earlier decision: "The law does not impose upon any person absolutely entitled to a hearing the burden of voluntary intervention in a suit to which he is a stranger.... Unless duly summoned to appear in a legal proceeding, a person not a privy may rest assured that a judgment recovered therein will not affect his legal rights." *Id.* at 763,

109 S.Ct. at 2185 (quoting *Chase National Bank v. Norwalk,* 291 U.S. 431, 54 S.Ct. 475, 78 L.Ed. 894 (1934)). The Court then addressed the way in which the Federal Rules of Civil Procedure incorporate the principle of *Chase National,* opting for a system of mandatory joinder rather than mandatory intervention. "Joinder as a party, rather than knowledge of a lawsuit and an opportunity to intervene, is the method by which potential parties are subjected to the jurisdiction of the court and bound by a judgment or decree." *Id.* at 765, 109 S.Ct. at 2186. We conclude that the Court's rationale indicates rejection of the City's argument.[9]

Finally, the City cites *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), in support of its argument that the United States is bound by the preclusive effects of *Howard.* We readily conclude that *Montana v. United States* is distinguishable from the case before us today. In *Montana,* a contractor on a federal dam project brought suit in state court contending that the Montana gross receipts tax unconstitutionally discriminated against the United States and the companies with which it contracted. In a unanimous decision, the Montana Supreme Court sustained the tax. Subsequently, the United States brought suit in federal court, arguing that the tax unconstitutionally discriminated against the United States and its contractors. The Supreme Court concluded that the federal action was barred by collateral estoppel because the United States "exercised control" over the contractor's litigation in the state court. *Id.* at 154, 99 S.Ct. at 974. The following facts supported the conclusion that the "United

---

**8.** As is suggested by the *East Baton Rouge* panel's reliance on *City of Richmond,* we strongly suspect that the Supreme Court's brief statement in that case is infused with the principles set out in more detail in *East Baton Rouge.* Since *City of Richmond,* the Supreme Court has expressly relied on the federal government's unique position to support the holding that the United States may not be collaterally estopped on an issue adjudicated against it an earlier lawsuit brought by a different party. *United States v. Mendoza,* 464 U.S. 154, 159, 104 S.Ct. 568, 572, 78 L.Ed.2d 379 (1984) ("We have long recognized that 'the Government is not in a position identical to that of a private litigant,'... both because of the geographic breadth of Government litigation and also, most importantly, because of the nature of

the issues the Government litigates.") (quoting *INS v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973) (per curiam)).

**9.** In fact, we think that where the government is the party against whom a preclusion-by-nonintervention argument is lodged, there are additional concerns mandating rejection of this argument. If the rule were indeed as the City argues, private litigants suing to enforce constitutional or statutory guarantees could force the United States to either intervene or be bound by the decision simply by giving the government notice of its interest in the pending suit. We do not believe the rules of preclusion impose such an onerous burden on the government.

States plainly had a sufficient 'laboring oar' in the conduct of the state-court litigation to actuate principles of estoppel": the United States required that the contractor file the state-court lawsuit; reviewed and approved the complaint; paid the attorneys' fees and costs; directed the appeal from State District Court to the Montana Supreme Court; appeared and submitted a brief as amicus in the Montana Supreme Court; directed the filing of a notice of appeal to the Supreme Court of the United States; and effectuated the contractor's abandonment of that appeal. *Id.* In the instant case, the City of Monroe has not even alleged that the United States exercised control over the *Howard* plaintiffs' litigation; in fact, what they have alleged is that the United States *refused* to take a role in the *Howard* litigation. *Montana v. United States* is therefore clearly inapposite. *See East Baton Rouge*, 594 F.2d at 58 (distinguishing *Montana* on similar grounds).

Because we cannot agree that the United States is precluded from relitigating the claims or issues before the *Howard* court, we turn to the first question of our § 5 inquiry.

### IV. DOES § 5 COVER THE CONTESTED CHANGE?

■ We address this first question *pro forma.* The City has never disputed that the shift from the pre-November 1, 1964 plurality-voting scheme to a majority-vote requirement is a change covered by § 5. Indeed, a majority-vote requirement is a clear example of a "standard, practice, or procedure with respect to voting" within the purview of § 5. *See City of Rome v. United States*, 446 U.S. 156, 159, 100 S.Ct. 1548, 1553, 64 L.Ed.2d 119 (1980). What the City does dispute is whether this change has been precleared; this brings us to the second question of our § 5 inquiry.

### V. HAS THE CHANGE BEEN PRE-CLEARED IN ACCORDANCE WITH § 5?

The City argues that at least one of two events precleared the majority-vote requirement. We examine each of these events in turn. First, we consider the argument that the Attorney General's failure to object to § 34A–1407(a) of the 1968 Statewide Code effected a preclearance of the City's majority-vote requirement. Second, we consider the argument that a preclearance occurred because of the Attorney General's conduct during the events surrounding the *Howard* litigation and the City's annexation submission.

#### A. *The Lack of Objection to the 1968 Statewide Code*

In its motion for summary judgment, the City argues that "the 1968 submission and the Attorney General's response to it mandate a finding of preclearance." The City notes that its submission did call to the attention of the Attorney General both the majority vote provision and the fact that the City was not including information with respect to the several affected municipalities. The City argues that notwithstanding the foregoing, the Attorney General interposed no objection and requested no additional information in order to determine the impact on specific municipalities. As the City states its argument:

> [T]he Department of Justice's acceptance of the majority vote requirement as submitted, in light of the express qualifications as to the nature of the information submitted is strong evidence of the fact that the Department of Justice adopted and pre-cleared as a *matter of policy* the prevailing majority vote requirement and the imminent changes from plurality to majority vote which would be mandated.

(Emphasis in original).

In response, the United States notes that the City's submission expressly stated that the effect of the majority-vote provision "will depend upon how the municipality's charter is written at present or may be written in [the] future," thus suggesting that the preclearance issue would be presented city by city. The United States argues that the lack of objection to § 34A–1407(a) only precleared the decision to defer to local charters as to whether election would be by majority or plurality; in its view, the lack of objection did not preclear changes in individual municipalities.

■ We need not delve deeply into the general principles that would govern our resolution of this issue because the Supreme Court, in a case involving another of Georgia's municipalities, has rejected the precise argument made by the City of Monroe. In *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980), the Supreme Court addressed "the constitutionality of the Voting Rights Act of 1965 and its applicability to electoral changes and annexations made by the city of Rome, Ga." *Id.* at 157, 100 S.Ct. at 1552. Like the City of Monroe, Rome elected its officials by plurality vote as of November 1, 1964;[10] like the City of Monroe, Rome had an unprecleared 1966 charter enacting a majority-vote requirement; and like the City of Monroe, Rome argued that despite the lack of preclearance for the 1966 charter, the City's majority-vote provision had been precleared by the Attorney General's response to the submission of the 1968 Code. The Court responded to this argument as follows:

> We also reject the appellants' argument that the majority vote, runoff election, and numbered posts provisions of the city's charter have already been precleared by the Attorney General because in 1968 the State of Georgia submitted, and the Attorney General precleared, a comprehensive Municipal Election Code that is now Title 34A of the Code of Georgia. Both the relevant regulation, 28 CFR § 51.10 (1979), and the decisions of this Court require that the jurisdiction "in some unambiguous and recordable manner submit any legislation or regulation in question directly to the Attorney General with a request for his consideration pursuant to the Act." *Allen v. State Board of Elections*, 393 U.S. 544, 571, 89 S.Ct. 817, 834–835, 22 L.Ed.2d 1 (1969), and that the Attorney General be afforded an adequate opportunity to determine the purpose of the electoral changes and whether they will adversely affect minority voting in that jurisdiction, see *United States v. Board of Commissioners of Sheffield*, Ala., 435 U.S. 110, 137–138, 98

S.Ct. 965, 982–983, 55 L.Ed.2d 148 (1978). Under this standard, the State's 1968 submission cannot be viewed as a submission of the city's 1966 electoral changes, for, as the District Court noted, the State's submission informed the Attorney General only of "its decision to defer to local charters and ordinances regarding majority voting, runoff elections, and numbered posts," and "did not ... submit in an 'unambiguous and recordable manner' all municipal charter provisions, as written in 1968 or as amended thereafter, regarding these issues." 472 F.Supp. 221, 233 (D.C. 1979).

*Id.* at at 169 n. 6, 100 S.Ct. at 1557 n. 6. The Court's rejection of Rome's argument dictates that we reject the argument Monroe makes today.

The City makes several attempts to avoid our application of *City of Rome* to the instant case. First, the City argues that the language quoted above is "mere dicta." We reject this characterization out of hand. The Supreme Court addressed an argument presented by the City that, if accepted, would have mandated reversal of the lower court's judgment (at least as to the claims to which the argument related); the Court expressly rejected that argument and proceeded to affirm the judgment of the district court. Contrary to the City of Monroe's assertions, the mere fact that the Court addressed this claim in a footnote does not affect its precedential nature.

Second, the City of Monroe argues that the Court's discussion in *City of Rome*, even if not dicta, is not dispositive of the instant case. The gist of the City's argument appears to be this: in the *City of Rome* case, the argument was that preclearance of the 1968 Act somehow "breathed life" into the unprecleared 1966 charter; by contrast, the City's argument here is that the preclearance of the 1968 Act precleared the use of majority vote in all cities, including Monroe, whose *valid* charter was silent as to whether major-

---

**10.** Unlike the City of Monroe, Rome's plurality-vote requirement was articulated in its pre-No- vember 1, 1964 charter. However, this factual

ity or plurality voting was the rule.[11] We cannot agree that this distinction renders the Supreme Court's disposition of the argument before it inapposite to the argument before us today. The Court's rationale focused squarely on the notion that the State's submission of the 1968 Statewide Code did not put before the Attorney General the propriety of changes in the voting practices of individual cities:

> [A]s the district court noted, the State's submission informed the Attorney General only of "its decision to defer to local charters and ordinances regarding majority voting, runoff elections, and numbered posts," and "did not ... submit in an 'unambiguous and recordable manner' all municipal charter provisions, as written in 1968 or as amended thereafter, regarding these issues."

We think this rationale forecloses the City of Monroe's argument.

### B. The Effect of the Events Surrounding the Howard Litigation and the City's Annexation Submission

■ The City also argues that it cannot be required to submit its majority-vote requirement for preclearance because the "1976 *Howard*-related [documentation] makes clear that the Department of Justice evaluated the City's use of majority vote in the § 5 process and that it passed muster under § 5." The gist of the City's argument seems to be that, although the majority-vote provision was never submitted to the Attorney General, and although the Attorney General never formally or expressly precleared it, the Attorney General should be deemed to have precleared the majority-vote requirement because the Attorney General actually considered and approved the change. After reviewing the record in light of the Supreme Court's preclearance jurisprudence, we must reject this "informal preclearance" argument.

The Supreme Court's decision in *McCain v. Lybrand*, 465 U.S. 236, 104 S.Ct. 1037, 79

L.Ed.2d 271 (1984), forecloses the argument made by the City. Although the Court seems to have assumed the possibility that preclearance might be effected informally under some circumstances,[12] the Court clearly contemplated that there could be no such preclearance short of proof that the Attorney General had actually considered and approved the merits of the change in question—i.e., determined that the change did not have a discriminatory purpose or effect. In *McCain*, the Court addressed a three-judge panel's conclusion that changes enacted by a 1966 statute and preserved in a 1971 amendment of the statute were precleared by the Attorney General's failure to object to a submission regarding the 1971 Act. To support its holding, the district court relied on alternative grounds, one of which was that "[the Attorney General] had considered all aspects of the electoral scheme, including the changes effected in the 1966 Act." *Id.* at 251, 104 S.Ct. at 1047. At the crux of the Supreme Court's rejection of this approach was the Court's conclusion that the record did not show that the Attorney General had in fact considered and approved the 1966 changes. In other words, the record did not show that the Attorney General had conducted the appropriate evaluation of the 1966 changes, as compared to the preexisting electoral system, and concluded that the 1966 changes had neither a discriminatory purpose nor a discriminatory effect. *Id.* at 251–57, 104 S.Ct. at 1047–49.

The record in the instant case, like the record in *McCain*, does not support an assertion that the Attorney General actually considered and approved the change made by the shift to majority voting. As the above recitation of facts shows, the Attorney General's Office had two types of documents before it in 1976 and 1977 regarding the City of Monroe: first, the *Howard* plaintiffs' request that the Attorney General either participate in *Howard's* § 5 challenge or bring a separate § 5 challenge; and, second, a sub-

---

difference is not relevant to the application of the *City of Rome* rationale to this case.

**11.** The City's argument turns on its concession that the 1966 charter, which expressly provided for majority vote, was invalid due to the lack of

preclearance. Thus, the City's *valid* charter was the earlier charter, which was silent as to the question of majority or plurality vote.

**12.** *See infra* note 17.

mission from the City of Monroe requesting preclearance of three annexations. The documents reveal that the Attorney General was aware of the following facts: that the City's elections were being conducted on the basis of a majority vote; that there was private litigation regarding whether the City's majority vote had been properly precleared; and that there was some question as to whether the failure to object to the 1968 statewide Code precleared majority voting in Monroe. The documents also suggest that, in the course of considering whether or not the submitted annexations had a discriminatory purpose or effect, the Attorney General took into account the fact that the City was using majority voting. However, nothing in either set of correspondence shows that the Attorney General made the difficult and complex decision that the shift from plurality to majority voting was not discriminatory in purpose or effect. The discussion within the Attorney General's Office about whether the 1968 Statewide Code precleared majority voting in Monroe does not constitute the "on the merits" evaluation contemplated in *McCain* (i.e., the evaluation of whether the change from plurality to majority voting has a discriminatory purpose or effect). The same is true with respect to the evaluation of the annexations. While that evaluation was conducted on the basis of the then-current electoral practices, including majority voting, the analysis conducted by the Attorney General to determine whether the annexations had a discriminatory purpose or effect is very different from an analysis comparing plurality versus majority voting.[13]

■ In addition to the informal preclearance argument addressed above, the City also seems to argue that the Attorney General was aware of an arguably unprecleared change, took no action, and therefore should be deemed to have precleared the change.[14] To address this argument (which is essentially a "preclearance by estoppel" argument), we do not find it necessary to discuss broad questions regarding when equitable estoppel principles may be invoked against the government; the Supreme Court's preclearance jurisprudence itself forecloses the argument that the Attorney General's failure to request submission bars the recovery sought before this court.[15]

■ The Supreme Court has rejected the argument that a preclearance is effected by the Attorney General's subjective awareness of an unprecleared change and failure to interpose an objection to that change. In *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), the

---

13. As for comparison of the substantive effects of plurality versus majority voting, we find in the record only an observation made by a research analyst (in the annexation analysis): "If it were *not for the majority vote requirement [as opposed* to a plurality], a black would have been elected to the City Council in 1970." This isolated comparison is not persuasive evidence that the Attorney General in fact addressed the difficult and complex issue of whether a shift from plurality to majority had a discriminatory purpose or effect. Moreover, this isolated comparison does not alter the fact that there is no evidence at all that the Attorney General actually concluded that the change was *devoid of* discriminatory purpose and effect.

14. This argument is *most* evident in the City's attempt to distinguish *McCain* on the basis of the fact that the Attorney General in *McCain* either did not recognize that the 1966 Act required preclearance or assumed that it had been precleared. *McCain*, 465 U.S. at 253 n. 23, 104 S.Ct. at 1048 n. 23. The City's argument that this factual difference requires a different result is tantamount to the preclearance by estoppel argument.

15. For an opinion rejecting a somewhat different "preclearance by estoppel" argument, see *Haith v. Martin*, 618 F.Supp. 410 (D.C.N.C.1985), aff'd, 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986) (mem.). In *Haith*, North Carolina officials argued that they should not be required to submit various changes regarding the election of judges because a letter from the Assistant Attorney General suggested (erroneously) that changes in the State's court system were not subject to section 5. In effect, the State argued that the representation should estop the United States from requiring the State to submit for preclearance changes enacted prior to the court's decision. The panel rejected that argument outright:

[T]he Act does not give this court the power to provide equitable relief to defendants, no matter how just their cause. *See*, 42 U.S.C. § 1973c [§ 5 of the Voting Rights Act].
By the very terms of the statute, covered changes in election laws may not be put into effect until they have either been precleared by the Attorney General or approved by the United States District Court for the District of Columbia. *Id.* at 414.

Supreme Court refused to hold that a change in voting practices had been precleared because the Attorney General received notice of the change through the briefs of the litigation at hand but submitted no objection. The Court wrote:

A fair interpretation of the [Voting Rights] Act requires that the State in some unambiguous and recordable manner submit any legislation or regulation in question directly to the Attorney General with a request for his consideration pursuant to the Act.

*Id.* at 571, 89 S.Ct. at 834–35. Similarly, in *United States v. Board of Commissioners of Sheffield,* 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978), the Supreme Court was presented with the argument that preclearance of a referendum to determine whether to switch to a mayor-alderman form of government constituted preclearance of the switch itself. The Court rejected this argument:

While the Act does provide that inaction by the Attorney General may, under certain circumstances, constitute federal preclearance of a change, the purposes of the Act would plainly be subverted if the Attorney General could ever be deemed to have approved a voting change when the proposal was neither properly submitted nor in fact evaluated by him.

*Id.* at 136, 98 S.Ct. at 981.[16] Having concluded that no proper submission was made, the *Sheffield* Court concluded that "the Attorney General did not intend to approve the proposed change to a mayor-council government and could not be understood as having done so." *Id.* at 137, 98 S.Ct. at 982.

As we understand it, the Court's decision in *McCain v. Lybrand* sets out the contours of whatever exception to the proper-submission rule may have been suggested by the language in *Sheffield* regarding whether a change was "in fact evaluated."[17] And *McCain,* as noted above, focuses not on whether the Attorney General proceeded in an ideal manner, but on whether the record shows that the Attorney General actually undertook an evaluation of the practical effects of the change at issue and actually found neither the purpose nor the effect proscribed by the statute.

The "preclearance by estoppel" argument fails today (as it did in *Allen*) because it would conflict with the very policies that underlie the § 5 procedure and the Supreme Court's jurisprudence in this area. The Court has repeatedly described the history behind § 5 and the burden it imposes on covered jurisdictions. In *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), the Court attributed the enactment of § 5 to the recalcitrance of many jurisdictions in the face of early voting rights litigation: "After enduring nearly a century of systematic resistance to the Fifteenth Amendment," the Court wrote, "Congress might well decide to shift the advantage of time and inertia from the perpetrators of evil to its victims." *Id.* at 328, 86 S.Ct. at 818. More recently, the Court has focused specifically on the justifications for requiring formal submissions:

Congress recognized that the Attorney General could not, in addition to these duties [to respond to proper submissions], also monitor and identify each voting change in each jurisdiction subject to

16. For purposes of clarity, we note that the first clause of the quoted statement—"the Act does provide that inaction by the Attorney General may, under certain circumstances, constitute federal preclearance of a change"—refers to the explicit provision of § 5 that the Attorney General will be treated as having approved a voting change if the change has been properly submitted and no objection has been interposed by the Attorney General within sixty days after such submission. *Sheffield,* 435 U.S. at 135, 98 S.Ct. at 981 (quoting 42 U.S.C. § 1973c).

17. It may actually be that there are no exceptions to the "proper-submission" rule: neither in the parties' briefs nor in our own research do we

find any case in which the Supreme Court has found a preclearance in the absence of a proper submission. We do not reach this ultimate question because we need not decide so much to resolve the case before us today. Today, we need only decide that the City of Monroe has not shown the substantive evaluation of a change that would, as a factual matter, force us to answer the legal question of whether *Sheffield* and *McCain* truly create an exception to the proper-submission rule. See discussion above rejecting the City's "informal preclearance" argument because the City failed to show the requisite substantive evaluation of the change.

§ 5. "[B]ecause of the acknowledged and anticipated inability of the Justice Department—given limited resources—to investigate independently all changes with respect to voting enacted by States and subdivisions covered by the Act," [*McCain*], 465 U.S. at 247, 104 S.Ct. at 1044–45, Congress required each jurisdiction subject to § 5, as a condition to implementation of a voting change subject to the Act, to identify, submit, and receive approval for all such changes.

*Clark v. Roemer*, 500 U.S. 646, 658, 111 S.Ct. 2096, 2104, 114 L.Ed.2d 691 (1991) (rejecting the argument that preclearance of an amended statute necessarily effects a preclearance of all unprecleared changes incorporated in that statute).

The City's "preclearance by estoppel" argument is subject to the same flaw the Supreme Court found in *Clark*: it "upsets th[e proper] ordering of responsibilities under § 5.... " *Id.* "Such a rule would diminish covered jurisdictions' responsibilities for self-monitoring under § 5 and would create incentives for them to forgo the submission process altogether." *Id.* The rule the City encourages us to adopt would encourage jurisdictions aware of existing, unprecleared changes not to submit those changes for immediate preclearance, but instead to comb through the files of the Department of Justice looking for evidence that might lead to a "preclearance by estoppel."

Finally, we find no tension between rejection of the City's "preclearance by estoppel" argument and the Supreme Court's decision in *Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977). In *Morris*, the Court held that the Attorney General's failure to interpose an objection within the statutory 60-day period is not subject to judicial review. Thus, as the City points out, a clerical error could bar the Department of Justice from interposing a § 5 objection to a change properly submitted for preclearance (if that error resulted in no objection being timely interposed). However, we cannot agree with the City that an anomaly would exist if the Attorney General could be barred by negligence in the former situation but not by the type of knowing decision implicated in the present case (i.e., the decision not to send the letter requesting the City to submit the majority vote for preclearance). *Morris* deals with the specific statutory provision that a covered jurisdiction may enforce a change that has been properly submitted if the Attorney General has not interposed an objection within sixty days (as counted under regulations promulgated by the Attorney General). The rule the City proposes would reach well beyond *Morris* and the statute to the very different proposition that the Attorney General could be barred by silence without regard to whether a proper submission has ever been made.

For the foregoing reasons, we conclude that the City's majority vote provision has never been precleared.

## VI. THE QUESTION OF LACHES

■ Before addressing the appropriate remedy, we must address the City's claim that the United States is barred by laches from bringing the instant suit. After reviewing the case law, we are persuaded that the instant government suit cannot be barred by laches.

As other courts have noted, the case law regarding when laches may be invoked against the government is less precise than might be desired. Although there exists an often-quoted principle that "laches is not a defense against the sovereign," *Costello v. United States*, 365 U.S. 265, 281, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961), the precise contours of the rule have been rendered somewhat unclear by various cases allowing laches to be invoked as a defense against the government. We find it unnecessary to attempt any grand synthesis of the existing case law in order to resolve the case before us today; the instant case is readily distinguishable from those cases in which courts have concluded that laches is appropriately invoked against the government.

One line of authority invoked to support the City's argument is a line of cases in which courts have allowed defendants to raise a laches bar to suits brought by the Equal Employment Opportunity Commission. In *Occidental Life Insurance Co. v.*

*EEOC,* 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977), a case in which the EEOC brought suit against an employer over three years after the employee first complained to the Commission, the Supreme Court addressed the question of "what time limitation, if any, is imposed on the EEOC's power to bring [a Title VII] suit." *Id.* at 357, 97 S.Ct. at 2450. Having rejected the employer's arguments that either federal law or State law created an inflexible time limit on the bringing of lawsuits, the Court wrote:

> It is, of course, possible that despite these procedural protections a defendant in a Title VII enforcement action might still be significantly handicapped in making his defense because of an inordinate EEOC delay in filing the action after exhausting its conciliation efforts. If such cases arise the federal courts do not lack the power to provide relief. This Court has said that when a Title VII defendant is in fact prejudiced by a private plaintiff's unexcused conduct of a particular case, the trial court may restrict or even deny backpay relief.... The same discretionary power "to locate 'a just result' in light of the circumstances peculiar to the case," ... can also be exercised when the EEOC is the plaintiff.

*Id.* at 373, 97 S.Ct. at 2458. In light of *Occidental Life,* lower courts, including the Eleventh Circuit, have relied on laches as grounds for dismissal of EEOC actions which have been inordinately delayed. *See EEOC v. Dresser Industries, Inc.,* 668 F.2d 1199, 1201–02 (11th Cir.1982) (citing similar holdings in other courts of appeal).[18] Here, the City invites us to draw an analogy between an EEOC suit to enforce federal anti-discrimination law and a Department of Justice suit to enforce the preclearance mandate of § 5. For the reasons set out below, we reject that invitation.

To illustrate the difference between the EEOC's position in a typical employment-discrimination suit and the Department of Justice's position in the preclearance suit before us today, a return to first principles is in order. As then-Justice Rehnquist pointed out in dissent in *Occidental Life,*[19] the Supreme Court long ago stated the scope of the laches inquiry as follows:

> The principle that the United States are not bound by any statute of limitations, nor barred by any laches of their officers, however gross, in a suit brought by them as a sovereign government to enforce a public right, or to assert a public interest, is established past all controversy or doubt.... But this case [a patent controversy] stands upon a different footing, and presents a different question. The question is, are these defenses available to the defendant in a case where the government, although a nominal complainant party, has no real interest in the litigation, but has allowed its name to be used therein for the sole benefit of a private person?

*United States v. Beebe,* 127 U.S. 338, 344, 8 S.Ct. 1083, 1086, 32 L.Ed. 121 (1888) (quoted in *Occidental Life,* 432 U.S. at 382, 97 S.Ct. at 2462 (Rehnquist, J., dissenting)). In the type of discrimination suits we have allowed to be barred by laches, the EEOC allows its name to be used for the sole benefit of private persons. *See Dresser Industries,* 668 F.2d at 1204 (distinguishing from EEOC suits properly barred by laches any suit brought by the EEOC "to prohibit [the employer] from pursuing a pattern of discrimination that is allegedly occurring [at the time of suit]"); *see also Occidental Life,* 432 U.S. at 373, 97 S.Ct. at 2458 (focusing specifically on the appropriateness of limiting backpay relief in cases involving an inordinate EEOC delay). Accordingly, in the cases appropri-

---

18. *Dresser Industries* expressly provides that the application of a laches bar to the EEOC suit before the court "by no means prevents the EEOC from filing a current charge, investigating it, and filing a new lawsuit if, as alleged, discriminatory practices are continuing." *Id.* at 1200 n. 2. Because we conclude that laches cannot bar the instant suit because the government here sues to vindicate its sovereign rights, we need not address the argument that the lack of preclear-

ance could be seen as a "continuing violation" and thus saved from a laches bar.

19. Justice Rehnquist argued that because an EEOC suit does not "seek[ ] to vindicate rights belonging to the United States as sovereign," such suits should be subject to State-law statutes of limitation.

ately barred by laches, the EEOC can be described as a "nominal complainant party."

By contrast, in suing to enforce the pre-clearance procedures of § 5, the United States has a real interest in the litigation and cannot be said to merely allow its name to be used for the "sole benefit of a private person." The statutory provisions assign to the federal government the function of determining whether covered changes have a proscribed purpose or effect before those changes are enforced. In discharging this statutory function, the government is charged with protecting a public interest of the highest significance—the right of all citizens to participate equally in the processes of democratic governance. *Cf. Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886) ("Though not regarded strictly as a natural right, but as a privilege merely conceded by society ... [the political franchise] is regarded as a fundamental political right, because preservative of all rights."). In a § 5 suit such as the one before us today, the government seeks to enforce its right to exercise this unique prerogative for the benefit of all of Monroe's citizens, present and future.[20] Because the preclearance function is a paradigm example of the government's functioning in its sovereign capacity, we conclude that the instant case falls well within the core of cases in which the United States is immune from the doctrine of laches.

In support of its argument that laches can constitute a bar to the Attorney General's prevailing in a § 5 suit, the City brings to our attention the decision in *United States v. Georgia*, No. C76–1531A (N.D.Ga. Sept. 30, 1977) (unpublished), *aff'd*, 436 U.S. 941, 98 S.Ct. 2840, 56 L.Ed.2d 782 (1978) (mem.). In *United States v. Georgia*, a three-judge panel

rejected a § 5 challenge brought by the Department of Justice regarding two provisions of the Georgia Election Code of 1964. Although it based its holding on a conclusion that there had been an effective preclearance, the panel also wrote:

> Although arguments of waiver and estoppel have been abandoned by the State, the court is constrained to note that the Attorney General's delay of eleven years in bringing an action for declaratory and injunctive relief to force the State to submit the complained of provisions to a preclearance procedure is inexcusable and, if allowed, would have placed the electoral system of the state of Georgia in an uproar on the eve of a general election.

■ Several things about *United States v. Georgia* and its precedential effect deserve mention. First, a summary affirmance by the Supreme Court "affirms only the judgment of the court below, and no more may be read into [the Court's] action than was essential to sustain that judgment." *Anderson v. Celebrezze*, 460 U.S. 780, 784 n. 5, 103 S.Ct. 1564, 1568 n. 5, 75 L.Ed.2d 547 (1983). The three-judge panel in *United States v. Georgia* did not hold that laches barred the government's suit (as the State had abandoned this argument); instead, it ruled in favor of the State on other grounds. Because the laches rationale can hardly be said to have been "essential to sustain the judgment," we cannot infer Supreme Court approval of the lower court's statements regarding the Attorney General's delay. As for the persuasiveness of the decision of the panel itself, we note that the opinion offers no discussion at all regarding how the case before it might be distinguished from the principles discussed above exempting sovereign governmental functions from the operation of laches.

---

**20.** We readily conclude, and the City does not argue otherwise, that the unique nature of the preclearance function removes the instant case from the parameters of the Supreme Court's decision in *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). In *Clearfield Trust*, the Court concluded that the United States was entitled to no special exemption from the rule that lack of prompt notice from a drawee of funds on learning of a forgery may bar the drawee's recovery. The Court wrote:

> The fact that the drawee is the United States and the laches those of its employees [is] not material.... The United States as drawee of commercial paper stands in no different light than any other drawee.... 'The United States does business on business terms.' It is not excepted from the general rules governing the rights and duties of drawees....

*Id.* at 576. In exercising the preclearance function, the United States performs a uniquely governmental function; *Clearfield Trust* is thus inapposite.

Finally, we note that in *Brooks v. State Board of Elections,* 775 F.Supp. 1470 (S.D.Ga.1989), *aff'd,* 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990) (mem.), a three-judge panel rejected an equitable argument somewhat similar to the one before us today. In *Brooks,* the panel rejected an argument that the lapse of time between the enactment of the change and the § 5 challenge to the change justified some kind of "equitable preclearance." This is somewhat different from Monroe's argument, which relies on the lapse of time following notice to the Attorney General of an unprecleared change; however, the reasoning of the *Brooks* panel is similar to the rationale that underlies our conclusion today. The panel wrote:

> We are mindful of the time that has elapsed since some of the changes were enacted. We cannot, however, "equitably preclear" any of the changes based on equity's rule of laches. *See McCain,* 465 U.S. at 249–52, 104 S.Ct. at 1046–47; *cf. Haith v. Martin,* 618 F.Supp. 410 (estoppel). Recognizing that the Attorney General could not keep track of changes relating to voting being made, Congress put the burden on the covered jurisdictions to seek preclearance to avoid the very problem we now face. We would do violence to the heart of section 5 if we were to excuse the State's failure to seek preclearance merely because the State has been disregarding section 5 for a long time. Moreover, Supreme Court precedent in this area is unambiguous. *Allen v. State Board of Elections,* 393 U.S. 544, 571, 89 S.Ct. 817, 834, 22 L.Ed.2d 1; *United States v. Sheffield Board of Commissioners,* 435 U.S. at 136, 98 S.Ct. at 981; *McCain v. Lybrand,* 465 U.S. at 249–51, 104 S.Ct. at 1045–46. Section 5 means what it says: absent preclearance, a covered change may not be enforced.

*Id.* at 1481–82.

For the foregoing reasons, we conclude that laches should not bar the United States in the instant action.

**21.** For the purposes of clarity, we emphasize that the nature of the relief granted is entirely pro-

## VII. THE APPROPRIATE REMEDY

■ In the instant case, the United States has requested an order enjoining the defendants from implementing the majority-vote requirement in mayoral elections until defendants obtain preclearance of the change. Our review of the Supreme Court's case law convinces us that the United States is entitled to the injunctive relief sought.

In *Clark v. Roemer,* 500 U.S. 646, 652, 111 S.Ct. 2096, 2101, 114 L.Ed.2d 691 (1991), the Supreme Court reiterated the general rule: "If voting changes subject to § 5 have not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting the State from implementing the changes." The Court carefully distinguished the case before it—involving "the *ex ante* question whether to allow illegal elections to be held"—from a line of cases addressing the "*ex post* question whether to set aside illegal elections." *Id.* at 654, 111 S.Ct. at 2102 (citing cases thus distinguished). The Court wrote:

> We need not decide today whether there are cases in which a district court may deny a § 5 plaintiff's motion for injunction and allow an election for an unprecleared seat to go forward. An extreme circumstance might be present if a seat's unprecleared status is not drawn to the attention of the State until the eve of the election and there are equitable principles that justify allowing the election to proceed. No such exigency exists here. The State of Louisiana failed to preclear these judgeships as required by § 5. It received official notice of the defect in July 1987, and yet three years later it had still failed to file for judicial preclearance, the "basic mechanism" for preclearance.... The District Court should have enjoined the elections.

*Id.*

In the instant case, we have concluded that the change to majority voting is a covered change that has not been precleared according to the dictates of § 5. As in *Clark v. Roemer,* we are presented only with the question of *ex ante* injunctive relief.[21] And,

spective: nothing we say here today should be understood to undermine the validity of actions

**1520**

as in *Clark v. Roemer*, we find no "extreme circumstance" that might justify denial of such injunctive relief: the City's mayoral elections are scheduled for November of 1997; the Attorney General objected to the majority-vote requirement in 1991 and filed the instant suit in June of 1994. There is no "eve of the election" problem in this case.

Accordingly, an order will issue providing the injunctive relief requested.

---

taken by officials elected in the City of Monroe prior to this order. As the three-judge panel wrote in *Brooks v. State Board of Elections*, 775 F.Supp. 1470 (S.D.Ga.1989), *aff'd*, 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990) (mem.):

> Section 5 contemplates injunctive relief, which is by its nature equitable. Moreover, the Supreme Court has indicated that the three-judge court has some limited discretion in fashioning a remedy by directing that the court must fashion an "appropriate" remedy. *See e.g., Perkins v. Matthews*, 400 U.S. 379, 396, 91 S.Ct. 431, 441, 27 L.Ed.2d 476 (1971) (question of appropriate remedy for district court); *cf., NAACP v. Hampton County Election Comm'n*, 470 U.S. 166, 183, 105 S.Ct. 1128, 1138, 84 L.Ed.2d 124 (1985) (discretion of district court). Thus, we must exercise our discretion in fashioning the appropriate remedy for the case at hand.

> As we discussed above, a three-judge court cannot rule that the covered changes have been "equitably precleared." At the other extreme, we are not required to rule ... that the covered changes are void *ab initio*, retroactively rendering void any actions taken by a[n official] whose position is the result of a covered change that was not precleared. Granting such a remedy would ... create genuine chaos.

*Id.* at 1482.

